## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NORTH SHORE MANOR, INC. | ) | Case No.  23-10809-JGR |
| | ) | |
| Debtor. | ) | Chapter 11, Subchapter V |
| _____ | ) | |
| NORTH SHORE MANOR, INC. | ) | |
| Chapter 11 Debtor-in-Possession, | ) | |
| | ) | Adversary Proceeding No.  23-01085 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COLUMBINE MANAGEMENT | ) | |
| SERVICES, INC; CENTRE | ) | |
| PHARMACY, INC.; CENTRE | ) | |
| ELDERLY TRANSPORTATION, INC.; | ) | |
| COLUMBINE DISTRIBUTION | ) | |
| CENTER, LLC; COLUMBINE | ) | |
| MEDICAL EQUIPMENT, INC.; FRONT | ) | |
| RANGE THERAPY SYSTEMS, INC. | ) | |
| d/b/a COLUMBINE THERAPY | ) | |
| SERVICES; and POUDRE INFUSION | ) | |
| THERAPY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER, DENY PRELIMINARY INJUNCTION, AND DISMISS CASE

Pursuant to Fed. R. Civ. P. 65 and 12(b)(6)-(7), applicable here under Fed. R. Bankr. P. 7065 and 7012, Columbine Management Services, Inc. ("CMS"), Centre Pharmacy, Inc., Centre Elderly Transportation, Inc., Columbine Distribution Center, LLC, Columbine Medical Equipment, Inc., Front Range Therapy Systems, Inc. d/b/a Columbine Therapy Services, and Poudre Infusion Therapy, LLC (collectively, the "Defendants") move the Court for an order

dissolving the temporary restraining order entered in this action (Doc. #13), denying any preliminary injunction,[1] and dismissing this action, with prejudice.

## BACKGROUND

**I.   INTRODUCTION**

1.     The Genesis of North Shore Manor's ("NSM") financial difficulties lies with its shareholders' decision to funnel Covid relief money to North Shore Associates ("NSA") and then to pay dividends to NSM's shareholders.

2.     The solution to NSM's current problems is equally simple.  NSM's shareholders need to return Covid relief money and recapitalize NSM so NSM can meet its obligations.

3.     Only Robert Wilson has stepped up to the plate to recapitalize NSM. He lent NSM $510,000 out of his own pocket with the expectation that other shareholders would step up too.

4.     All other NSM shareholders have chosen a path to stiff creditors.  The problem is shareholder greed, except for Mr. Wilson who is the only shareholder who has  met his responsibilities and who is the only shareholder to put the welfare of the residents and employees over his own personal financial gain.

5.     NSM has not demonstrated entitlement to injunctive relief, the complaint should be dismissed, and the restraining order should be vacated.

---

[1] NSM has not filed a motion for preliminary injunction or otherwise indicated it will seek one. The Court already granted NSM's sole requested relief, a temporary restraining order through April 14, 2023.  And at its April 10 Rule 341 meeting, NSM's representative testified that NSM has procured replacement performance for all of Defendants' contracts, removing the need for any preliminary injunction.  But NSM often pivots its positions, and the Court set an April 14 hearing "for a preliminary injunction on the matters raised in the Verified Complaint."  Defendants oppose any preliminary injunction for the reasons stated in this Motion.

DN 7687117.3

6.      NSM cites to certain terms in the Management Agreement with CMS. The Management Agreement is a bilateral contract.  NSM omits any discussion of its obligations under the bilateral Management Agreement.  NSM conceals that NSM first breached the Management Agreement, including defaulting on its payment obligations to CMS.  NSM urges the Court to force CMS to perform under the Management Agreement for free while NSM remains in breach.

7.      After exaggerating claims and demonizing CMS, NSM asks the Court to allow NSM to continue exploiting CMS and creditors by forcing them to perform on contracts while continuing to stiff those creditors.

8.      NSM shareholders have substantial inherited wealth. The solution is for them to recapitalize NSM.  They refuse to do so.  The solution is not to further victimize creditors by forcing them to work for free.

## II.   NSM SHAREHOLDERS

9.      During the 40 years of CMS's good management, NSM shareholders were regularly paid dividends until late in the pandemic.

10.     CMS or its predecessor affiliates have managed NSM for over 40 years. Initially NSM's ownership rested with four families. The initial owners are deceased, and the current shareholders inherited their shares. The current shareholders have substantial inherited wealth and express no interest in the facility or its residents except to cash dividend checks. Those wealthy investors received monthly financial reports with their monthly dividend checks, expressing interest only in receiving and cashing monthly dividend checks.

3

11.     Covid adversely impacted NSM's facility. Early in the pandemic the facility had a Covid outbreak.  The resident population dropped dramatically. Government Covid relief money kept the facility afloat, and NSM shareholders continued cashing dividend checks.

12.     Covid relief money has abated.  The Management Agreement obligated NSM to recapitalize under these circumstances. All other shareholders, except Mr. Wilson, refused to recapitalize NSM.

13.     We are where we are simply because of the greed of passive shareholders with inherited wealth who refuse to recapitalize NSM even though they have the financial resources to do so.

14.     CMS or its predecessor affiliates managed the facility for over 40 years. NSM's initial shareholders are deceased, and their shares passed to their heirs who are the current shareholders with exception of Mr. Wilson who is in his 70's and who still owns 15% of the outstanding shares. NSM's current shareholders are the following:

| Shareholder | Shares | Percent of Outstanding Shares |
|---|---|---|
| Joshua A Levin Trust dated January 1, 2020 as Amended fbo Joshua A. Levin, Channa Levin, trustee | 31 | 3.125% |
| Joshua A Levin 2018 Trust, Joshua A. Levin, trustee | 31 | 3.125% |
| Esther Levin Trust, Mosh Levin and Esther Levin, co-trustees | 63 | 6.25% |
| Baruch Levin and Lynne Levin | 63 | 6.25% |
| Menachem M. Levin | 31 | 3.125% |
| Shoshanna Levin | 31 | 3.125% |
| Linda Fogel | 188 | 18.75% |
| Beth Radetsky | 113 | 11.25% |
| Mark Kohn | 300 | 30.00% |
| Robert Wilson | 150 | 15.00% |
| Total | 1001 | 100.00% |

4

15.     As shown above, the largest shareholder is Mark Kohn who owns 30% and who resides in Merion Station, Pennsylvania. CMS is not aware of Mark Kohn ever personally taking any interest in  the NSM facility or the welfare of the residents.

16.     Mark Kohn has a son named Meyer Kohn ("Kohn"). Kohn has a law degree and looks after his father's investment in NSM.  Kohn's address is unknown to CMS.  However, his telephone area code indicates a Palm Beach, Florida location.

## III.   THE RELATIONSHIP BETWEEN NSM AND NORTH SHORE ASSOCIATES; NSA FUNNELS MONEY TO NSA PARTNERS

17.     North Shore Associates ("NSA") is a separate company.  NSA is a partnership. NSA owns the facility building and leases the building to NSM.

18.     NSA's partners are identical to NSM's shareholders.  Not only are they the same persons, but also each owner owns an identical percentage in each company.

19.     From 2018 to 2022 NSM paid $3,752,000 in rent to NSA as follows:

| Year | Rent Payments |
|------|---------------|
| 2018 | $840,000 |
| 2019 | 840,000 |
| 2020 | 840,000 |
| 2021 | 840,000 |
| 2022 | 392,000 |
| Total | $3,752,000 |

20.     NSA funneled the rent payments to NSM shareholders through monthly distributions to the NSA partners/NSM shareholders.  From 2018 through 2022 NSM shareholders received $2,971,250 in dividends, itemized as follows:

5

| Shareholder | Amount |
|---|---|
| Mark Kohn | $899,800.00 |
| Linda Fogel | 556,125.00 |
| Fruma Levin Family Trust | 2,937.50 |
| Fruma Levin Trust | 62,750.00 |
| Baruch or Lynn Levin | 185,375.00 |
| Ester Levin Trust | 185,375.00 |
| Joshua Levin Trust | 85,937.50 |
| Joshua A. Levin Trust | 27,000.00 |
| Menachem or Shoshana Levin | 187,375.00 |
| Beth Radetsky | 333,675.00 |
| Bob Wilson | 444,900.00 |
| TOTAL | $2,971,250.00 |

21.     As a result of the above dividend payments, NSM did not retain working capital to sustain its operations.

22.     The Management Agreement contemplated and addressed the possibility for a working capital short fall:  the Agreement required NSM to recapitalize if it needed working capital.

23.     Only Mr. Wilson returned money to NSM.  Mr. Wilson made a $510,000 interest free loan to NSM. The other shareholders, however, refused to find their wallets.  Kohn then developed a scheme to stiff Mr. Wilson and other creditors. Instead of recapitalizing and paying creditors, Kohn contrived a bankruptcy to use money available for pre-petition creditors to fund post-petition working capital needs.

**IV.    COVID RELIEF PAYMENTS**

24.     From 2020 through 2022 NSM received Covid relief payments totaling about $4,153,599.93 from a variety of governmental programs, including PPP, HHS Provider Relief Funds and Medicare Stimulus Funds summarized as follows:

6

| Year | Amount |
|------|--------|
| 2020 | $2,642,205.22 |
| 2021 | 485,133.59 |
| 2022 | 1,026,261.12 |
| Total | $4,153,599.93 |

25.     Covid relief money was used to fund dividends and was not retained for working capital needs.  As described above, only Mr. Wilson returned all his dividends plus more to NSM for NSM's working capital needs.  All other shareholders have returned a total of $0.

## V.     THE MANAGEMENT AGREEMENT

26.     In 2004 NSM and all then living shareholders signed the current Management Agreement.  The Management Agreement put CMS in charge of managing the NSM facility, including locating the facility's suppliers and service providers.  See Management Agreement section 1.02(e) and (i). NSM twists the Management  Agreement to suggest it was unfair to NSM. If fact, NSM benefitted from economies of scale and collective purchasing power through the CMS network of facilities, and this collective purchasing power contributed to NMS's success and profitability which enabled NSM to pay millions in dividends to NSM shareholders. All the original shareholders recognized the benefit of collective purchasing power and signed the Management Agreement.  Unfortunately, their passive investor heirs twist the words and meaning of the Management Agreement to take advantage of the rest of the CMS network.

27.     The Management Agreement is a bilateral contract with each side obligated to perform their respective contract obligations. NSM cites to only CMS's contractual obligations. NSM does not discuss NSM's reciprocal contractual obligations to CMS. And NSM fails to disclose that NSM first breached its obligations to CMS, that those breaches are continuing, that

DN 7687117.3

CMS lawfully terminated the Management Agreement, and that NSM is unable and unwilling to cure its defaults.

28.     Section 4.00 of the Management Agreement provides as follows to require NSM to pay CMS a monthly management fee:

> Each month during the term hereof, Manager shall receive from Owner and Owner shall pay to Manager as the amount due for services, a management fee equal to five and one-half percent (5.5%) of the Gross Revenues of the Facility.

29.     NSM did not pay monthly management fees that were due to CMS on February 1, 2023, in the amount of $66,330,52.  Nor did NSM pay management fees due on March 1, 2023. Instead, NSM filed bankruptcy on March 6, 2023. NSM breached its contract obligation to pay management fees to CMS before it filed bankruptcy.  NSM has not cured those defaults or provided any assurances that it will do so.  In fact, NSM stated that it will not cure its defaults.

30.     Management Agreement § 2.03 states the Owners' recapitalization obligation as follows:

> Owner shall provide sufficient working capital for the operation of the Facility or Company and shall make deposits in the Operating Accounts of such working capital from time to time upon the request of Manager.

31.     Covid caused NSM to encounter working capital shortages and CMS asked NSM to recapitalize NSM by $1,000,000.  Mr. Wilson offered to contribute his 15% share ($150,000). But NSM and all other NSM shareholders breached § 2.03 by refusing to recapitalize NSM or to deposit any money into NSM's bank account. Instead, Kohn and NSM chose to stiff creditors, place the residents at peril, and file bankruptcy. Simultaneously, NSM shareholders demanded (through NSM's attorney) that Mr. Wilson purchase their shares for more than what they are worth,

DN 7687117.3

or else Mr. Wilson and CMS would be embarrassed by the bankruptcy of a facility with CMS's name on the door.  Instead of recapitalizing NSM, Kohn set out to extort Mr. Wilson.

32.    Section 2.03 of the Management Agreement further provided as follows:

All costs and expenses incurred in the operation of the Facility or Company shall be paid out of the Operating Account. Manager shall specify the signatory or signatures required on all checks or other documents or withdrawal for the Operating Account.

33.    Section 2.03 is a standard property management provision in which the manager manages the bank account while arranging for the delivery of goods and services.

34.    In November 2022, Kohn unilaterally added his name and signature authority to NSM's operating account and began withdrawing funds without CMS' prior knowledge or consent.  Kohn withdrew substantial funds from the operating account to implement a plan to stiff creditors.  Kohn took funds withdrawn from the account to pay a lawyer to extort Mr. Wilson. Kohn took funds from the account needed to pay NSM suppliers.  Kohn's unilateral withdrawal of funds from the account breached the Management Agreement. Kohn's withdrawal of funds compounded NSM's working capital deficiency and financial difficulties and naturally placed NSM with insufficient funds that CMS needed to pay NSM suppliers.  Kohn's actions not only breached the Management Agreement, but also made it impossible for CMS to perform under the Management Agreement and to pay vendors and care for residents.  But Kohn did not care about paying vendors the residents' welfare.  He instead devised a plan to stiff Mr. Wilson and other creditors so his father would not need to repay dividends.

35.    Section 2.03 of the Management Agreement further provided:

Manager shall also have the right to secure and maintain a Line of Credit on behalf of the Owner in the amount up to $500,000.

36.     In 2022 NSM was in financial difficulties, was not profitable, and could not procure bank financing without personal guaranties of ownership. Again, only Mr. Wilson stepped up to the plate and guarantied NSM's loan with the First National Bank of Omaha ("FNBO"). But FNBO's loan did not meet NSM's working capital needs.  Mr. Wilson personally lent NSM $510,000 to keep NSM afloat.  He reluctantly made the loan as a bridge loan pending receipt of NSM's $1,000,000 recapitalization from shareholders. But that recapitalization never came. Instead, Kohn set out to stiff Mr. Wilson and the CMS network and put NSM into bankruptcy.

37.     NSM first breached the Management Agreement as described above[2] while CMS was still performing in good faith under the Management Agreement. Section 5.02 of the Management Agreement describes CMS's remedy resulting from NSM's prior breach as follows:

> If Owner or Manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed, or performed by it and such default shall continue for a period of thirty (30) days (or ten (10) days in the case of a failure to pay any amounts due Manager under this Agreement) after  notice thereof by one to the other, then in case of any such event and upon the expiration of any period or grace applicable thereto, the term of this Agreement shall expire, at the option of the non-defaulting party, on five (5) days' written notice to the other party of termination.

38.     Due to NSM's prior breach of the Management Agreement, on Friday, February 24, 2023, CMS gave written notice of termination of the Management Agreement. On Monday, February 27, 2023, the written notice of termination was sent again by certified mail, return receipt requested.  Not receiving management fees, and knowing Kohn's determination to stiff creditors, CMS became increasingly concerned about the residents' welfare.  Kohn demonstrated no interest

---

[2] The defaults included failure to pay management fees; failure to recapitalize; taking over and withdrawing funds from the Bank account and failure to cooperate to timely pay vendors.

DN 7687117.3

or concern about resident or employee welfare.  Had Kohn cared about either, he would have simply asked his father to return his fair share of the dividends to avoid the crisis he made.

39.     NSM's Management Agreement defaults included failure to pay management fees due on February 1, 2023, in the amount of $66,330.52.  Due to this monetary default NSM's cure period was 10 days from either February 24 or February 27, depending upon whether notice was effective with or without a certified mailing.  Either way, on March 6, 2023, NSM filed bankruptcy and decided to take not cure or provide assurances of cure of its prior Management Agreement defaults.

40.     Section 3.03 of the Management Agreement addresses the circumstances present here because of NSM's prior existing breach:

> Manager shall not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its reasonable control including, without limitation, lack of working capital recommended by Manager . . . .

In short, § 3.03 excuses CMS from performing under the Management Agreement when NSM did not make available to CMS the funds needed for performance.

41.     Section 4.0 of the Management Agreement provides that "In addition to the Management Fee, Manager shall be reimbursed for all out-of-pocket expenses incurred by Manager directly relating to the management of the Facility."  Section 7.08 of the Management Agreement further states that "All fees, costs, expenses and purchases arising out of, relating to or incurred in the operation of the Facility including, without limitation, the fees, costs and expenses of outside consultants and professionals, shall be the sole responsibility of Owner."  Section 7.08

DN 7687117.3

entitles CMS to recover its post-petition expenses NSM has caused CMS to incur.  NSM has provided no assurance that it has funds to perform or will perform this obligation to CMS.

## VI.  POST-PETITION NSM TOOK EMPLOYEE MONEY AND USED IT TO OPERATE

42.     NSM filed bankruptcy on March 6, 2023.  On March 8, 2023, NSM's new Chief Executive Officer, Ronald Church ("Church") completely took over the NSM facility, the bank accounts, employee management, and resident welfare.  Church also demanded and received all resident health records.  His actions confirmed the Management Agreement's termination.  CMS is no longer the manager and is no longer in a position of responsibility for the employees, residents, and resident medical records.

43.     CMS has informed the court, NSM, and the Subchapter V Trustee of the following misuse of employee moneys after Church took control.

   a.     Payroll is paid every two weeks. An outside payroll service provider named Mosaic oversaw payroll.  On payday Mosaic ACH'ed from NSM's bank account funds needed to pay payroll taxes plus net wage payments owed to employees. Funds were left in NSM's operating account to pay employee benefit payments deducted from employee paychecks for health, life, accident, vision and dental insurance premiums, and to pay retirement contributions. Historically, funds withheld from employee paychecks remained in NSM's operating account until the last day of the month, then remitted to the various insurers to pay employee insurance premiums and retirement contributions from money deducted from their paychecks.

DN 7687117.3

b.   Payroll fell on March 6, 2023—the same day NSM filed bankruptcy. Mosaic withdrew payroll taxes and net pay from NSM's operating account and paid payroll taxes, and net pay owed to employees, as in the past. On March 6, 2023, Church and Kohn took complete control of NSM's bank account containing funds withheld from employee paychecks.  NSM has not remitted the funds collected from employee paychecks to pay employee insurance premiums or retirement contributions.  Instead, NSM, Church and Kohn have used the employees' funds to operate.  CMS has repeatedly made these facts known to NSM, its counsel and to the Sub-chapter V Trustee. To CMS's knowledge NSM, Kohn, and Church have not accounted to employees for funds deducted from employee March 6, 2023 payroll. By now NSM's employees have learned that their retirement contributions deducted from their paychecks have not been remitted to Fidelity Investments which oversees the employees 401(k) plan.

c.   The next payroll was paid on March 20, 2023. Before that date, Mosaic closed its portal which CMS used to manage payroll, and Church opened a new portal with Mosaic. CMS has no information on the March 20, 2023 payroll.  But CMS is familiar with NSM's Employees Benefits Programs, which are bundled with about 1,350 other network employees who have nothing to do with NSM.  Based on the information available to CMS, it appears that again on March 20, 2023, Church, Kohn and NSM did not account for moneys taken from employee paychecks on that date.

13

d.      At the April 10, 2023 meeting of creditors Church and his assistant, Ms.
Prill, testified that NSM has less than $100,000 on deposit with the Bank.
In short, NSM has a cash shortfall and has used employee money withheld
from employee paychecks to operate.

## VII.    THE VENDOR AGREEMENT

44.     NSM's attorney requested that six vendors in the CMS network continue to deliver
goods and services after the bankruptcy petition date.  The Vendors were reluctant to enter into a
post-petition supply agreement with NSM, having been stiffed and mistreated by Kohn and NSM.
The Vendors deem Kohn to be untrustworthy and are concerned that Kohn will continue to take
advantage of creditors. Notwithstanding their mistrust of NSM, the Vendors agreed to enter into a
temporary post-petition Vendor Agreement for the residents' welfare.

45.     NSM's attorney prepared a Vendor Agreement and sent it to the Vendors' attorney.
The parties' attorneys negotiated the Vendor Agreement. NSM claims no ambiguity in the Vendor
Agreement because none exists.  NSM now sues the Vendors for entering into the Vendor
Agreement and urges the court to rewrite the Agreement to NSM's liking.

46.     The Vendors made it clear to NSM from the onset that the Vendors do not trust
NSM and that the Vendor Agreement was intended to be a temporary agreement while NSM found
replacement suppliers.  The Vendor Agreement permitted the Vendors to terminate on seven days'
notice.  But the Vendor Agreement permitted NSM to terminate on one day's notice, consistent
with the understanding that NSM would find replacement suppliers without delay.

47.     The Vendor Agreement required a COD weekly retainer payment each Wednesday
for deliveries during the next seven days.  During the first week the Vendor Agreement was in

14

DN 7687117.3

effect NSM ordered, and two Vendors delivered, goods and services exceeding the retainer. That forced two Vendors to supply post-petition credit for post-petition deliveries. Importantly, these are the same vendors that Kohn set out to stiff for prepetition payables. The Vendors' discomfort with extending post-petition credit to NSM should come as no surprise.

48.     After two weeks CMS gave a week's notice of termination of the Vendor Agreement. After the run-off period the Vendor Agreement would be in place for 22 days, more than sufficient time for NSM to find replacement vendors. However, instead of finding replacement vendors NSM sued CMS and the Vendors to force them to continue making deliveries under the Vendor Agreement. Similarly, NSM sued CMS for continuing performance under the Management Agreement without payment of compensation to CMS.

49.     NSM has had plenty of time to find replacement vendors. Any emergency is an emergency of NSM's own creation. Church should have found replacement Vendors by now. They are not hard to find. Church has created his own emergency to request emergency relief.

50.     NSM can easily locate replacement vendors. The goods and services CMS and the Vendors supply are commonly available in the Loveland area.

51.     With respect to vendor Centre Pharmacy, NSM can conduct a Google search and find many pharmacies within a 20-mile area of Loveland. In any event, CMS has been informed that on April 7, 2023, NSM found a replacement pharmacy.

52.     To replace vendor Columbine Elderly Transportation, NSM can easily contract with an alternative ambulance company, or rely on Uber, taxis, or Dial-A-Ride.

DN 7687117.3

53.     To replace vendor Columbine Distribution Center, LLC, NSM can easily get supplies from many alternative suppliers, including McKesson, Amazon, Walmart, Medline, or Premier Medical.

54.     With respect to vendor Columbine Medical Equipment, NSM can easily get medical equipment from McKesson, Joerns Healthcare, Good Day Pharmacy, Major Medical, Apria Healthcare or Medline.

55.     With respect to vendor Front Range Therapy Systems, NSM can easily arrange with UC Health Physical Health and Rehab, Banner Physical Therapy, or many physical therapy offices and suppliers in the area which can easily be found by a Google search.

56.     With respect to vendor Poudre Infusion Therapy, NSM can arrange for infusion therapy at the UC hospital.

57.     Instead of honoring the Vendor Agreement's seven-day termination provision and finding replacement suppliers, NSM sued CMS and the Vendors to force them to continue to do risky business with NSM.

## VIII.   NSM HAS FAILED TO JOIN NECESSARY PARTIES

58.     Next, NSM sued CMS to force CMS to continue to provide property and liability insurance and employee benefits to NSM under bundled insurance plans.  But CMS is not the insurer. CMS simply arranged for bundled insurance policies with various insurance companies, and those bundled policies yielded premium savings which benefited all facilities in the CMS network.  Determining whether property no longer affiliated with CMS is eligible for inclusion on those policies is a decision of the insurers, not CMS. Instead of suing CMS, NSM needs to sue the insurance companies to enjoin them from terminating their insurance policies.  Post-petition NSM

16

DN 7687117.3

has refused to pay premiums on the policies, a complication of NSM's own doing.  NSM sues to force others to provide goods, services, and insurance while providing no payment assurance.

59.     CSM has supplied copies of all insurance policies to NSM. To recap, the insurers (the "Insurers") are as follows, all of whom are indispensable parties to the relief NSM requests:

| Policy Type | Insurance Company | Policy No. | Policy Dates |
|---|---|---|---|
| D&O | Berkley National Insurance Company PO Box 1594 Des Moines, Iowa 50306-1594 | BHP1800026603 | 7/1/22 to 7/1/23 |
| General Liability | Ironshore, a Liberty Mutual Company Ironshore Specialty Insurance Company 175 Berkeley Street Boston, MA  02116 | HC7AACAYHH002 | 7/1/22 to 7/1/23 |
| Professional Liability | Gemini Insurance Company | VPPL017631 | 7/1/22 to 7/1/23 |
| Commercial Auto Policy | Selective Insurance Company of the Southeast 900 E. 96th Street Indianapolis, IN  46240 | S 2502645 | 7/1/22 to 7/1/23 |
| Commercial Policy Package | Selective Insurance Company Branchville, NJ  07890 | S 2502644 | 7/1/22 to 7/1/23 |
| Consulting E&O Policy | Gemini Insurance Company | VPPL016017 | 7/1/22 to 7/1/23 |
| Cyber Liability | Tokio Marine HCC Houston Casualty Company 13403 Northwest Freeway Houston, TX  77040 | H22NGP209461-02 | 7/1/22 to 7/1/23 |
| Excess Policy | Ironshore, a Liberty Mutual Company Ironshore Specialty Insurance Co. 175 Berkeley Street Boston, MA  02116 | HC7AACAYF2002 | 7/1/22 to 7/1/23 |
| Workplace Violence | Indian Harbor Insurance Company 505 Eagleview Boulevard, Ste 100 | US00118251SP22A | 7/1/22 to 7/1/23 |

DN 7687117.3

| Policy Type | Insurance Company | Policy No. | Policy Dates |
|---|---|---|---|
| | Exton, PA  19341-1120 | | |
| Workers Comp | Midwest Employers Casualty Co, | EWC009652 | 1/1/23 to 1/1/24 |
| Personal Needs Bond | Merchants Bonding Company P.O. Box 14498 Des Moines, IA 50306-3498 | CO 8774 | 12/31/22 to 12/31/24 |

60.     The Insurers are necessary parties to NSM's lawsuit.  Simply put, NSM sued the wrong persons in this case to force CMS to do something that is beyond its control.  NSM must sue the insurance companies for the injunctive relief NSM requests.

61.     Likewise, NSM sues CMS to do something beyond CMS's control with respect to the Employee Benefit Plan.

62.     NSM's employees are no longer eligible for inclusion in the Employee Benefit Plan because they are no longer a part of an "affiliated service group" as defined by IRC § 414(m). The fact that NSM's employees can no longer to participate in the Employee Benefit Plan is determined by federal law.  A lawsuit against CMS cannot change federal requirements for group Employee Benefit Plans.

63.     NSM employees have always been NSM employees, and not CMS employees, and the Management Agreement § 1.02(a) confirms this:  "All such employees, including the Administrator, shall be employees of Owner and carried on the payroll of the Facility and shall not ne deemed employees  or agents of Manager."

64.     In sum, NSM sued CMS to force CMS to not comply with federal law.  Non-compliance with IRC § 414(m) jeopardizes all 1,500 employees enrolled in the Employee Benefit Plan, 90% of whom have nothing to do with NSM.

DN 7687117.3

65.     NSM has again sued the wrong person.  If NSM wants to enjoin the consequences of IRC § 414(m) it needs to sue the United States of America, and not CMS.

## IX.     NSM IS OPERATING WITHOUT TRANSPARENCY

66.     NMS is operating using Wapello Holdings II, LLC's ("Wapello II") cash collateral. Over Wapello II's objections NSM is operating without any transparency. NSM's first financial reporting is not due until it files its monthly operating report on April 20 for the month ending March 31.  Without reporting, at this juncture one can only speculate if NSM is using cash collateral in violation of the budget.  However, it does not appear that the budget provides for NSM's remittance of funds taken from employees' March 6, 2023 paychecks. Likewise, the budget does not provide for payments to the newly found "back-office services provider."  It is also uncertain whether the payments to the Vendors are within the budgetary guidelines.

67.     At the April 10, 2023 meeting of creditors, the Debtor gave vague testimony on whether it is complying with the court's mandated budget for the use of cash collateral.  The Debtor has less than $100,000 in the Bank.  At the same time, it appears that NSM, Church and Kohn owe NSM over $100,000 for employee funds taken from employee paychecks used to operate.

68.     At the meeting of creditors Church testified that the census (bed occupancy) fell from 103 on the petition date to 91.  CMS appears to be going out of business without regular reporting and without developing a plan to relocate residents.

69.     CMS remains concerned about NSM's disorganized operations, lack of transparency and the residents' welfare.  NSM has not given reports to confirm whether cash collateral usage conforms to the Court's order.

19

## ARGUMENT

NSM lacks entitlement to the only relief it has pled:  injunctive relief.  "A preliminary injunction is 'an extraordinary remedy never awarded as of right,' it is 'the exception rather than the rule.'"  Harmon v. City of Norman, 981 F.3d 1141, 1146 (10th Cir. 2020)(citation omitted).[3] The "movant must make a 'clear and unequivocal' showing it is entitled to such relief."  State v. EPA, 989 F.3d 874, 883 (10th Cir. 2021).  "A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and 'the right to relief is clear and unequivocal.'"  DTC Energy Group v. Hirschfeld, 912 F.3d 1263, 1270 (10th Cir. 2018).

> To obtain preliminary injunctive relief, or  . . . additional preliminary injunctive relief, a movant must show the following: 1) the movant is likely to succeed on the merits at trial; 2) the movant will likely suffer irreparable harm in the absence of such relief; 3) the equities weigh in favor of the movant; and 4) injunctive relief is in the public interest.

In re Content Dist., 2011 WL 5244900, *4 (Bankr. D. Colo. 2011).  "An injunction can issue only if each factor is established."  Denver Homeless Out Loud v. Denver, 32 F.4th 1259, 1277 (10th Cir. 2022).  "The Tenth Circuit specifically disfavors injunctions that will  . . .  mandate an affirmative act by the defendant [or] afford the movant all the relief that he could recover at the conclusion of a full trial on the merits."  Melnick v. Williams, 2023 WL 179930, *2 (D. Colo. 2023).

## I.   NSM HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

"To evaluate the likelihood of [NSM] prevailing over Defendants on the merits, the Court must assess the relative strengths of the opposing lines of argument."  In re Rare, 298 B.R. 762,

---

[3] "'The issuance of an injunction under section 105(a) is governed by the standards generally applicable to the issuance of injunctive relief in non-bankruptcy contexts.'"  In re LTL Mgt., 645 B.R. 59, 81 (Bankr. D.N.J. 2022).

DN 7687117.3

764 (Bankr. D. Colo. 2003).  NSM "must identify specific, real-word facts and demonstrate that, based on those facts, the movant is at least 'likely' to succeed on the merits of a viable legal cause of action."  In re Homaidan, 640 B.R. 810, 831 (Bankr. E.D.N.Y. 2022).

A.      **The Court Already Ruled that NSM May Not Enforce the Management Agreement**

On March 31, 2023, the Court entered an order (the "Rejection Order") finding, among other things, that the "management agreement dated October 1, 2004, by which Columbine Management Services, Inc. provided services to North Shore Manor, Inc. is deemed REJECTED as of April 14, 2023.  On or before April 14, 2023, North Shore Manor, Inc. must retain a manager to run its skilled nursing facility."  Doc. 139.

The "law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir.1991)(citation omitted).  Courts base the doctrine "on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided," Gage v. General Motors Corp., 796 F.2d 345, 349 (10th Cir.1986) (citations omitted), avoiding a "wasteful expenditure of resources by courts and litigating parties and the gradual undermining of public confidence in the judiciary." McIlravy, 204 F.3d at 1035. "The promotion of judicial economy—a primary concern underlying the law of the case doctrine—requires that litigants be encouraged to present all available claims and defenses at the earliest opportunity." Id. A court has discretion to apply the law of the case doctrine and "it may be applied irrespective of

21

whether a final judgment has been reached." <u>Lester v. City of Lafayette</u>, 2015 WL 13613269, at *2 (D. Colo. 2015).

NSM seeks to relitigate a resolved issue—whether NSM can attempt to weaponize the Management Agreement against CMS despite NSM's prior material breaches.  In the Rejection Order the Court has already deemed the Management Agreement rejected as of April 14.  Law of the case bars any argument to compel CMS to continue performance under the Management. The Court should reject NSM's attempt to relitigate this issue, which will result in a "wasteful expenditure of resources by [the court] and litigating parties and [will undermine] public confidence in the judiciary." <u>McIlravy</u>, 204 F.3d at 1035.

**B.      NSM's Prior Material Breach of the Management Agreement Precludes NSM's Claim**

> If there has been a default in an executory contract or unexpired lease of the debtor, [NSM] may not assume such contract or lease unless, at the time of assumption of such contract or lease, [NSM]—
> (A) cures, or provides adequate assurance that [NSM] will promptly cure, such default . . . .
> (B) compensates, or provides adequate assurance that [NSM] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  "Under Section 365, one cannot be compelled to perform a contract that the debtor has materially breached unless the breach is cured."  <u>Ring v. Ted's Jumbo Red Hots</u>, 2022 WL 465075, *5 (W.D.N.Y. 2022).  NSM has never cured its defaults under the Management Agreement and § 365 bars NSM from assuming the Agreement.

A "a debtor-in-possession under Chapter XI 'cannot accept the benefits of an executory contract without accepting the burdens as well."  <u>In re Trigg</u>, 630 F.2d 1370, 1374-75 (10th Cir.

DN 7687117.3

1980)(citation omitted).   "A contract that provides for termination on the default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition under the Bankruptcy Act."   Id. at 1374.     So courts may not grant an injunction to compel performance of agreements that "had lapsed by their own terms"  and courts have "'rejected the [] argument that the bankruptcy court possesses equitable jurisdiction to remedy this type of situation.'"   Id. at 1373-74 (citation omitted).   "A debtor in bankruptcy has no greater rights or powers under a contract than the debtor would have outside of bankruptcy."   Valley Forge Plaza Assocs. v. Schwartz, 114 B.R. 60, 62 (E.D. Pa. 1990).   So an agreement's "valid cancellation" does "did not violate the automatic stay."   Id.   See also In re Bolin Oil, 51 B.R. 936, 938 (Bankr. N.D. Ohio 1985)("The Bankruptcy Code does not enlarge the rights of NSM under a contract, and it doesn't prevent the termination of a contract by its own terms.").

And under contract law, a party to a contract cannot claim its benefits where he first violates its terms.   See Coors v. Sec Life of Denver Ins., 112 P.3d 59, 64 (Colo. 2005).   A "party's failure to perform under a contract precludes that party's demand for performance by the other party." Hemmann Mgt. Svcs. v. Mediacell, 176 P.3d 856, 859 (Colo. App. 2007).   "Upon a material breach of a contact, the injured party is 'excuse[d from] further performance' and is entitled to recover damages."  Gravina Siding and Windows v. Gravina, 515 P.3d 37, 42 (Colo. App. 2022).

**C.**     <u>**NSM Has Failed to Join Necessary Parties**</u>

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may

23

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). NSM seeks relief from the Insurers without joining them. Any insurance-related injunction could not be entered without the Insurers as parties: the Court could not accord complete relief, the injunction would impair the Insurers' ability to protect their interests, and the injunction would subject CSM to substantial risk of inconsistent obligations as to the Insurers. Likewise, relief from IRC § 414(m) requires joining the IRS, which NSM has failed to do.

### D.    NSM Has No Entitlement to Rewrite the Vendor Agreement

"The injunctive relief in the Bankruptcy Code is designed to give the Debtor a breathing spell with respect to its existing contracts, not a special advantage with respect to its future contracts." In re Bogey's Barn, 47 B.R. 555, 556 (Bankr. S.D. Fla. 1985). "It is clear that the Bankruptcy Code 'does not enlarge the rights of [NSM] under a contract, and it doesn't prevent the termination of a contract by its own terms.'" In re Fields, 2006 WL 1476142, *1 (Bankr. W.D. Ky. 2006). "'The Code does not, however, grant [NSM] bankruptcy greater rights and powers under the contract than he had outside of bankruptcy. The court finds nothing in the Code which enlarges the rights of the debtor under the contract or which prevents the termination of the contract on its own terms.'" In re Heaven Sent, 37 B.R. 597, 598 (Bankr. E.D. Pa. 1984)(citation omitted).[4] Equitable powers under § 105 "have not been interpreted to go so far as to allow the Court to

---

[4] The Heaven Sent court rejected the argument and case law that NSM espouses here. See id. The Heaven Sent debtor, like NSM here, insisted that the "inevitable result" of denying an injunction "will be the cessation of the debtor's business and a liquidation of its assets." Id. The court, "fully cognizant of the debtor's plight and the ramifications of our decision," denied the injunction. Id.

rewrite contracts or create new contractual rights between the debtor and a third party." In re Enterpriser Lighting, 1994 WL 774636, *3 (Bankr. E.D. Va. 1994).

*Post-petition* NSM entered a Vendor Agreement with a clear termination right.  NSM did not object to that right and agreed to be bound by the termination provision.  The Vendors have exercised their termination right, yet NSM wants the Court to scratch those rights out of the Vendor Agreement.  Nothing in § 105 or any other law allows such a rewrite.

## II.    NSM HAS NOT SHOWN IRREPARABLE HARM ABSENT AN INJUNCTION

"'Demonstrating irreparable harm is 'not an easy burden to fulfill.  [T]he movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" DTC Energy Group v. Hirschfeld, 912 F.3d 1263, 1270 (10th Cir. 2018)(citation omitted).  But a "showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Dominion Video Satellite v. Echostar Satellite, 356 F.3d 1256, 1260 (10th Cir. 2004).  The "Tenth Circuit has instructed that 'simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.'" Barrington v. United Airlines, 566 F. Supp.3d 1102, 1113 (D. Colo. 2021)(citation omitted).  "'Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Denver Homeless Out Loud v. Denver, 32 F.4th 1259, 1278 (10th Cir. 2022)(citation omitted).  So courts will not find irreparable harm when the case "is not a situation where the contract is with a vendor which is a sole supplier of an essential product or service [that] cannot be obtained from anyone else," even if other sources "might or would cost more." Bogey's Barn, 47 B.R. at 556.

DN 7687117.3

NSM's irreparable harm argument goes like this:  if the Court does not force Defendants to keep performing their contracts for free while NSM breaches, then NSM will fail.  NSM then tries pulling heartstrings by tying the residents' well-being to NSM's success, but NSM's conduct betrays a complete disinterest in the residents' well-being.  And forcing Defendants into unpaid business dealings with NSM will not prevent any harm contrived by NSM.  They should have been able to replace Defendants' services and products long ago and their failure to do that shows fatal flaw in NSM's position:  NSM will fail with or without enjoining Defendants.

## III.   NSM HAS NOT SHOWN THAT THE BALANCE OF EQUITIES WEIGHS IN ITS FAVOR

NSM—through its majority shareholders and current management—sacrificed the company and the residents to preserve shareholder dividends.  They breached contracts with Defendants then convinced the Court to force Defendants to perform anyway.  Defendants have performed but they should not be forced to continue doing so because the balance of equities weighs heavily against NSM.

## IV.   NSM HAS NOT SHOWN THAT AN INJUNCTION IS IN THE PUBLIC INTEREST

For injunction purposes, "'it is in the public interest for laws to be obeyed and contracts to be observed.'"   B. Method Franchisor v. Henderhiser, 580 F. Supp.3d 979, 997 (D. Colo. 2022)(citation omitted).  "Upholding any contract is an important public interest" due to the "'strong public interest in fair dealing between businesses and the solemnity of contracts; if commerce is to function smoothly, entrepreneurs must play by the rules.'"   In re PTI Holding, 346 B.R. 820, 832 (Bankr. D. Nev. 2006).  So courts will not enter "an injunction [which] adversely

26

DN 7687117.3

affects freedom of contract." <u>Id.</u>  NSM demands injunctive relief that violates these policies.  The Court should reject that demand.

<b><u>CONCLUSION</u></b>

NSM's inability to honor its contracts and operate its business—except with the force of this Court's injunctions—should tell the Court all it needs to know about how NSM got here and why the Court should stop forcing others to backstop NSM's inevitable failure.  The Court should dissolve the temporary restraining order, deny any preliminary injunction, and dismiss this lawsuit.

DATED April 12, 2023.

Respectfully submitted,
SPENCER FANE LLP

*/s/John O'Brien*
John O'Brien  #15183
Scott C. Sandberg #33566
Zachary Fairlie #68057
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Phone: (303) 839-3800
Email:  jobrien@spencerfane.com; ssandberg@spencerfane.com; zfairlie@spencerfane.com
Attorneys for Columbine Management Services, Inc., Centre Pharmacy, Inc., Centre Elderly Transportation, Inc., Columbine Distribution Center, LLC, Columbine Medical Equipment, Inc., Front Range Therapy Systems, Inc. d/b/a Columbine Therapy Services and Poudre Infusion Therapy, LLC

DN 7687117.3

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on April 12, 2023, I served via CM/ECF system an electronic copy of the foregoing on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed. R. Bankr. P. and the L.B.R. at the following addresses:

> Aaron Garber agarber@wgwc-law.com
> US Trustee USTPRegion19.DV.ECF@usdoj.gov
> Robert Samuel Boughner Samuel.boughner@usdoj.gov
> Jolie A. Lofstedt joli@jaltrustee.com

The undersigned further certifies that on April 12, 2023, a true and correct copy of the foregoing was served to the following by first class, postage prepaid U.S. Mail:

| | |
|---|---|
| North Shore Manor, Inc.<br>201 Columbine St., STE 15<br>PO Box 6362<br>Denver, CO  80206 | U.S. Trustee<br>Byron G. Rogers Federal Building<br>1961 Stout St., Ste. 12-200<br>Denver, CO  80294 |
| Leah McMahon<br>State Long-Term Care Ombudsman<br>Colorado State Long-Term Care Ombudsman Program<br>c/o Disability Law Colorado<br>455 Sherman Street, Suite 130<br>Denver CO 80203 | Jo Tansey<br>State of Colorado Department of Health<br>Branch Chief Acute and Nursing Facilities<br>4300 Cherry Creek Drive South<br>Denver, CO  80246 |
| Kay Blackman<br>Licensing and Certification Specialist<br>Colorado Department of Public Health and Environment<br>4300 Cherry Creek Drive South<br>Denver, CO 80246 | Shelley Sandermannn, JD<br>Enforcement Services Program Manager<br>Health Facilities and Emergency Medical Services<br>4300 Cherry Creek Drive South<br>Denver, CO 80246-1530 |

> _/s/John O'Brien_____
> John O'Brien

28

DN 7687117.3